THE STATE *ex rel.* KELLEHER *et al.*, v. BOARD OF PRESIDENT AND DIRECTORS OF ST. LOUIS PUBLIC SCHOOLS *et al.*

Division Two, May 12, 1896.

1. **Mandamus**: SCHOOL ELECTION: APPOINTMENT OF ELECTION OFFICERS. *Mandamus* is properly brought in the name of the state, on the relation of taxpayers residing in a school district, wherein an election of a school director is to be held, to compel the board and its members constituting the election committee to rescind certain appointments of judges and clerks, made by such committee, for the election of a member of the board.

2. ———: INFERIOR TRIBUNAL: ABUSE OF DISCRETION. While *mandamus* will not ordinarily lie to control the action of an inferior tribunal in whom a discretion is vested as to the performance or nonperformance of duties devolved upon it by law, yet, if the discretionary power is exercised with manifest injustice, the courts are not precluded from commanding its due exercise.

3. ———: SCHOOL BOARD ELECTION: JUDGES AND CLERKS: VACATION OF APPOINTMENT. Where a school board has been guilty of a gross abuse of the discretion conferred on it by statute, to fix the time, place, and manner of conducting elections of members of the board, by selecting for purely partisan ends judges and clerks of such election, who are all members of the same political party, and by persistently and arbitrarily refusing to hear or to accede to requests of taxpayers for the appointment of election officers from different political parties, the supreme court, in the exercise of its superintending control over inferior tribunals, will, by *mandamus*, compel the board to rescind the appointments so made and to select judges and clerks from different political parties.

*Mandamus.*

PEREMPTORY WRIT AWARDED.

*Charles T. Noland* and *Houghton & Brownrigg* for relators.

*Charles B. Starke* and *Rowell & Ferriss* for respondents.

GANTT, P. J.—This is an original proceeding commenced in this court on the twenty-seventh day of April, to obtain a peremptory writ of *mandamus* directed to the board of president and directors of the St. Louis public schools, and certain members of said board constituting the "election committee" of said board, requiring said board and the individual members named in the application to set aside certain appointments of judges and clerks made by said election committee on April 18, 1896, for the election of a member of said board on the fifth day of May, 1896.

The alternative writ issued, returnable April 30, 1896, and an order made shortening the time for taking proofs in support of the alternative writ.

On the return day the respondents joined in a motion to quash the writ and in a joint return.

Inasmuch as the election was appointed for the fifth of May and if the relief sought should be granted it was necessary the writ should issue promptly, if at all, upon due consideration, we directed the writ to issue prior to filing of an opinion.

The petition substantially alleges that the relators, John P. Kelleher and John F. Ryan are resident taxpayers and citizens of the city of St. Louis, and reside in the tenth district as laid off and constituted for the election of a district director of the said board. That said board is a public corporation created and existing by virtue of the laws of this state for the management of the public schools of the city of St. Louis, and among other powers conferred upon it is the power

"to prescribe the time, place, and manner of conducting the elections of members of said board;" that said board now consists of thirteen district directors and seven directors at large; that a vacancy exists in said board as to the district director from the tenth school district of said city; that a full board consists of twenty-one directors; that the individual respondents constitute a majority of said board at present, and have confederated together to manage and control the affairs of said corporation in their own interests and in the interest of the republican party, in utter disregard of the rights of others, and of the best interest of the public schools; that said Bus is president of said board and that respondents Lacey, Koenig, Godfrey, Landvogt, and Rebenack constitute a majority as against two other members of the committee of said board which has been appointed and has control of elections to said board, and that of this committee Messrs. Landvogt, Koenig, and Rebenack are a subcommittee, which, together with said committee, have immediate management of the conduct of the election herein mentioned; that said Bus was elected by the present majority and one member since resigned, and said election committee was appointed by said Bus, who has a deciding vote in case of a tie.

It was further averred that among other rules prescribed for the election of members of said board were the following:.

"Section 2. Any convention of delegates, or any primary election as hereinafter defined by sections 5 and 6, held for the purpose of making nominations for directors of this board may nominate candidates. Said nominations shall be made by filing of certificate of nomination executed and acknowledged before a notary public with the same formalities as an instrument affecting real estate; the certificate of nomination, which

may consist of one or more writings, shall contain the name of the person nominated, his residence and occupation and also the name and address of each signed. The certificate may also designate by name the party or principle which such nominee shall represent."

"Section 5. A convention of delegates within the meaning of above section 2 is a convention of delegates of any organized party which at the last school election for directors or at the last national, state, or city election shall have cast at least three per cent of the entire vote cast in the city or district for which the nomination is made.

"Section 6. A primary election within the meaning of said section 2 is an election held within the city or district as the case may be by members of any political party or by the voters of some political faith for the purpose of nominating candidates for directors provided that the said party shall have cast at least three per cent of the entire vote cast within the city or district for which the nomination is made."

It is further alleged that relator Kelleher has been duly nominated for district director in said board from the said tenth district by a primary election held by the democratic party of said district and his nomination duly certified and filed in accordance with said rules; that the democratic party is an organized political party and cast more than three per cent of all the votes cast at the last school, national, state, and city elections within said district and city; that said Kelleher possesses all the qualifications required by law and the rules of said board for a director in said board; that Charles F. Mertens has likewise been nominated by the republican party of said district for the said vacant directorship.

It is further represented to the court that the object and intent of creating said board was to place the control of the school affairs of said city beyond the

domination of any political party and to secure for the management thereof men of integrity, ability, honesty, and fair mindedness who would in all cases be guided in their administration of said affairs by the true interests of the people and children of said city and not by the dictation of political party or cliques; that the majority of said board and the election committee, with one exception, are all members of the republican party; that before Messrs. Landvogt, Vordtriede, Spinning, Godfrey, Koenig and Kessner were nominated by the republican party for their positions in said board they pledged themselves that if elected they would go into a caucus of the republican members of said board and be guided in their action as members thereof by said caucus, and so shape their conduct as to promote the interests of the republican party.

It is then averred that said subcommittee on elections did on or about the eighteenth day of April, 1896, appoint the judges and clerks for said election to be held on May 5, 1896, and that each and every one of said judges and clerks so appointed, *forty-two* in number, were strong, professed, and partisan members of the republican party, and that the expressed intent and purpose of said committee in said appointments was to control said election to the last degree in the interest of the republican party and to defeat relator Kelleher.

It further appears from the petition that prior to the appointment of said judges and clerks, said relator Kelleher appeared before said election committee and asked to be heard and to present names of reputable and qualified citizens and voters for appointment as judges and clerks of said election and was refused not only representation among said judges and clerks but was denied a hearing, and that a committee of highly reputable citizens, irrespective of party affiliations, likewise appeared before said board and were denied the

right to submit a request for an honest and fair election and for the appointment of impartial judges and clerks or equal distribution of the officers of said election.

The respondents move to quash this writ for the reasons: *First*, that it does not set forth facts sufficient to entitle relators to the relief prayed; *second*, the law does not make it the duty of the board to appoint judges and clerks of different political parties; *third*, there is no law requiring defendants to give relators the relief sought; *fourth*, *mandamus* does not lie to revoke an appointment already made.

Reserving their right to a ruling upon their motion to quash, respondents, by leave of the court, filed their return, which admitted the citizenship of relators; their residence in the tenth district; the incorporation of the board; the vacancy of the tenth district; denied that the republican members constituted a majority of the board and that they are confederated together to control the same in the interest of the republican party; admit that Bus is president, but deny he has deciding vote in case of a tie; admit the rules concerning the nomination of directors as pleaded by relators; admit Kelleher has been duly nominated; deny that a majority of the board are members of the republican party, and a general denial of all the remaining allegations, and an averment that by virtue of its charter the board has the power to prescribe the time, place, and manner of conducting elections of its members; that under its rules a committee was appointed to select judges and clerks and selected the same and reported them and they were approved by the board; that the judges and clerks were all competent, disinterested men and qualified for their positions and were selected in the customary manner.

The evidence establishes that the board of the

president and directors of the St. Louis public schools is a public corporation created by a special act of the general assembly of Missouri, February 13, 1833, and subsequent amendments thereto, including the act of March 31, 1887, fixing the number of directors at twenty-one, seven to be elected by the city at large and fourteen by districts; that among other powers conferred upon the board is that "prescribing the time, place, and manner of conducting the elections of members of the board;" that some time prior to the fourteenth day of April, 1896, there was a vacancy in the said board by reason of the resignation of the district director of the tenth district; that thereupon a special election was ordered to be held in said district on May 5 to fill said vacancy.

It then appears without contradiction that Henry Bus was and is the president of the St. Louis school board; that the board is composed at present of twenty members, of whom ten are republicans and ten democrats; that the president appoints the committee on elections; that on March 30 he appointed an election committee of seven, of which number Charles G. Penny alone was and is a democrat; that on or about the fifth or sixth day of April, 1896, said election committee held a meeting in the said school board building, and at that time and before the judges and clerks for the election of May 5 had been appointed, Mr. Hugh Brady, and Robert Rutledge, members of the democratic party, appeared before said election committee as a committee appointed in behalf of the democrats, and asked to have a fair representation in the appointments of clerks and judges to be made, and presented the names of reputable citizens for that purpose, which request was refused, and that thereupon Mr. Landvogt, a republican member of said committee, presented a list of judges and clerks, all of whom were and are re-

publicans, for appointment. Mr. Penny objected to making all the appointments from the republican party but the committee adopted the list. Thereupon Messrs. Brady and Rutledge requested the privilege of one challenger at each precinct and this was also refused.

It also appears without question that after these judges and clerks were appointed a committee of citizens appeared before the board, and through Mr. Arthur Lee, requested the privilege of addressing the board in the interest of obtaining a fair representation for the democrats in the judges for the election on May 5, and this, on motion of Mr. Grawe, another republican, was also refused.

It is further shown by the evidence that on the fifteenth of February, 1896, a convention of the republican party was held at Harmony Hall, Eighteenth and Olive streets, for the nomination of directors at large for the school board; that at that meeting Messrs. Landvogt, Koenig, Spinning, Godfrey, Lacey, and Rebenack were nominated; that prior to their nominations a resolution was adopted in these words: "Resolved that all candidates nominated at this convention be instructed to enter a caucus of the republican members of the school board, and be guided by the decision of the caucus in the matters pertaining to the shaping of the public school system in accordance with republican principles, and candidates accepting nominations of this convention so pledge themselves."

When the election committee were considering whether they would allow democrats representation, Mr. Koenig, a republican member, said it was a republican committee and so far as he was concerned he would not give the democrats representation either as judges, clerks, or challengers.

The evidence also tended to show that this was the

first time a delegation of citizens was ever denied a hearing by the board and that the board had never before failed to give both political parties representation in the appointment of judges and clerks.

It further appears that the tenth school district is composed of the sixteenth and twenty-fourth wards of the city of St. Louis; that the official returns in said wards in 1892 gave O'Neill, democrat, two thousand, four hundred and twenty-nine, and Joy, republican, two thousand, two hundred and eighty-seven, votes for congress, and in 1894, the same district gave Espenchild, democrat, two thousand, three hundred and twenty-seven; Joy, republican, two thousand, four hundred and ten votes.

I.    This action is properly brought in the name of the state to the use of relators who are both citizens and taxpayers of the tenth school election district in which the proposed election is to be held. *State ex rel. v. Hoblitzelle*, 85 Mo. 620, concurring opinion of SHERWOOD, J.; *State ex rel. v. Railroad*, 86 Mo. 13; *State ex rel. v. Francis*, 95 Mo. 44; *State ex rel. v. St. Louis School Board*, 131 Mo. 505.

II.    Granting, however, the right of relators to invoke *mandamus*, if the writ is allowable at all, it remains to meet the objection of respondents that such a remedy is not open to relators under the averments of the alternative writ and the facts disclosed in evidence, for the reason that *mandamus* does not lie to revoke the appointments already made nor revise the action of the board, however arbitrary. This is the vital point in this case and summed up in a word is this, where the facts are undisputed, or stand confessed by the pleadings, and it appears to the court having superintending jurisdiction over an inferior court, tribunal, or corporation that such court or corporation has arbitrarily abused the discretion confided to it by the

law, or its charter, and no other adequate remedy is open to the aggrieved party, can this court by its writ of *mandamus* control such inferior tribunal or corporation so as to correct such *abuse* and compel it to exercise its discretion so as to conform to lawful and just methods of procedure.

By this motion to quash as well as by wholly failing to controvert any of the facts shown by relators in evidence, this case stands as upon demurrer with the facts conceded, and their sufficiency in law alone challenged.

The ordinary function of this extraordinary original writ at common law is familiar. It is a command in the name of the state, directed to some tribunal, corporation, or public officer, requiring it or him to do some specific act or particular thing in the writ specified which the court has previously determined that it is the duty of such tribunal, corporation, or officer to perform. Whether we treat the board as a single legal entity, or its directors as public officers, no doubt can exist that it is a body to whom the writ may issue according to established legal principles; it is quite as obvious that unless this writ is available relators are without an adequate remedy to obtain a fair election.

Recurring, then, to the main contention, that the board of directors having once made a list of appointments its action is not subject to be revised by a writ of *mandamus* from this court, however great the abuse of the discretion confided to it, or however arbitrary its conduct under the circumstances, let us inquire if such indeed is the law of the land.

While it is generally true that *mandamus* will not lie to control the discretion of an inferior tribunal in whom a discretion is vested in the performance or non-performance of certain duties devolved upon it by law, it is well settled that if the discretionary power is exer-

VOL. 134 mo—20

cised with manifest injustice the courts are not pre-cluded from commanding its due exercise. Such an abuse of discretion is controllable by *mandamus*.

Thus in *Ill. State Board, etc., v. People ex rel.*, 13 N. E. Rep. 201, 123 Ill. 227, it was held that while the state board of dental examiners has the right to decide whether the college at which an applicant for license graduated was a reputable college or not, it must decide that question upon just and fair principles, and not upon motives of self interest to crush out a rival college to the one in which its members are interested as members of its faculty; the court holding, in effect, that a public officer or inferior tribunal may be guilty of so gross an abuse of discretion or such an evasion of positive duty as to amount to a virtual refusal to perform the duty enjoined or *to act at all in contemplation of law*, and that in such case *mandamus* is an appropriate remedy.

In *Village of Glencoe v. People ex rel.*, 78 Ill. 382, the same learned court said: "The discretion vested in the council can not be exercised arbitrarily, for the gratification of feelings of malevolence, or for the attainment of merely personal and selfish ends. It must be exercised for the public good, and should be controlled by judgment, and not by passion or prejudice. *When a discretion is abused*, and made to work injustice, it is admissible that it shall be controlled by *mandamus*." *Arberry v. Beavers*, 6 Tex. *loc. cit.* 472; *Comm'rs of Poor v. Lynah*, 2 McCord (S. C.), 170.

The supreme court of New York in *People ex rel. v. Superior Court*, 5 Wend. 114, discussing the jurisdiction of the court, say: "The jurisdiction of this court by *mandamus* is one of immense importance and extent. * * * It extends to all inferior courts and tribunals," and, in controlling their discretion, it is said, "The security of the citizen is essentially increased

whenever the territory of *undefined discretion*   *   *   *
is circumscribed by the establishment of well defined
and clear principles." A statement of the law ap-
proved and indorsed by this court in *Fretwell v.
Laffoon*, 77 Mo. 26.

In *State ex rel. v. State Board of Health*, 103 Mo.
22, this court adopts in the following words the limita-
tion of the general rule as announced in *Ill. State
Board, etc., v. People ex rel.*, 13 N. E. Rep. 201, *supra:*
"There are some limitations upon the rule just stated;
for, if the board of health *should exercise its powers
with manifest injustice, then the courts may, and will, con-
trol the abuse of authority by the writ of mandamus.*"

These authorities sufficiently indicate that when
an inferior tribunal or official body, charged with the
performance of a duty involving a discretion in the
exercise thereof, is guilty of a gross and palpable viola-
tion of the discretion confided to it, this court, in the
exercise of the superintending control conferred by the
constitution of the state, will control the inferior tribu-
nal by its writ of *mandamus*, especially if the right
violated pertains to the public. This court has as
extensive powers and duties in this respect as the court
of King's Bench in England. As was said in *Strong's
Case*, 20 Pick. 495, "in every well constituted govern-
ment, the highest judicial authority must necessarily
have a supervisory power over all inferior or subordi-
nate tribunals, magistrates and all others exercising
public authority. If they commit errors, it will correct
them. If they refuse to perform their duty, it will
compel them. In the former case by writ of error, in
the latter by *mandamus*.   *   *   *   It not only lies to
ministerial, but to judicial officers."

It was urged in argument by learned counsel for
respondents that the relators had no legal right to
demand that the board should appoint democratic

judges. Stated in this form, possibly not, but they did have, and do have, the legal right to protest against the appointment of a *purely partisan set of republican judges and clerks for partisan purposes*. No defense of this arbitrary and unprecedented action of the board was attempted, save and alone that the law gave the board the power to make such appointments, and the courts were powerless to correct or indeed revise their arbitrary action.

To this construction of its power we can not give our assent. When the legislature conferred this power of appointment it was necessarily implied that it was not a warrant for an arbitrary and unjust use of it, but that it should at all times be exercised for the best interest of the people and children of St. Louis considered as an entire body politic and for the conservation of the great and sacred trust committed to their keeping for strictly educational purposes, and that it should never be prostituted to the building up of any sect, or party.

And where, as in this case, a majority of partisans refuse arbitrarily to permit those of different political views, though equal in numbers and in interest, and citizens without reference to party affiliations, to respectfully petition and demand that the election officers shall not be all of one party, and this in a district where the two great parties are so equally divided that it is extremely doubtful which predominates, but one conclusion can be legitimately drawn from their conduct and that is that they had predetermined to hold said election solely in the interest of their own political organization. Every presumption of correct and impartial official conduct in holding said election is negatived by the persistent, defiant, and repeated refusal of the majority to allow any one of the forty-two election officers appointed to be other than a

republican, though this action was in contravention of all precedent in any character of elections by the people of St. Louis.

There are neither fees, emoluments, nor perquisites lawfully connected with the performance of the duties of the members of the board of president and directors of the St. Louis public schools, and this circumstance would make it pleasant to note the alacrity displayed by certain citizens of St. Louis in so cheerfully and unselfishly devoting their time to the performance of the important and arduous duties of the board, without reward or remuneration, were it not for this exhibition of extreme partisanship, which inevitably forces upon us the unwelcome thought that *other considerations* than pure and unmixed virtue and patriotism have led to these sacrifices of time.

This school board was organized to control and manage the affairs of the schools of St. Louis. Taxes and revenues to the amount of $1,000,000 a year are levied and collected from various sources and pass through their hands to support these schools, and educate the children. Real properties of immense value are under its control. The citizen is taxed without reference to his politics or religion, and he has a clear and an inherent legal and constitutional right to see that his taxes shall go to the support of the school alone, and not to foster any political party, church, or sect whatever.

The constitution of Missouri prohibits the general assembly or any county, city, town, township, school district, or other municipal corporation, from ever making an appropriation, and from paying, from any public fund whatever, anything in aid of any religious creed, church, or *sectarian* purpose, and from helping to support or sustain any private or public school, academy, seminary, college, university, or

other institution of learning, controlled by any religious creed, church, or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state or any county, city, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever.

Within the spirit of this provision of our organic law we hold that the prohibition of the constitution is as imperative against the support of a republican or a democrat school out of public funds or taxes exacted from all citizens of party affiliations as it is against the support of a Catholic, Baptist, Presbyterian, or Methodist school. Sectarianism includes adherence to a distinct political party as much as to a separate religious sect. Webster's International Dictionary; Century Dictionary, "Sectarianism."

And one need not be possessed of a great amount of prevision to fortell that if a school board, elected and pledged to be guided by the decision of a political caucus to shape the public school system in accordance with the partisan principles of the party nominating and electing it, can refuse all other citizens and adherents of all other parties from participation in the conduct of elections of its members, it will soon degenerate into a self-perpetuating body, and it will only be a short step to the adoption of the kindred policy of employing none but their own partisans for teachers and the exclusion of all literature and school books save those which inculcate their own partisan views and uphold their own political tenets, and thus entirely pervert the purpose of the state in adopting the system.

It is true, it is argued that while each one of the forty-two officers is a republican, he is qualified to act as a judge or clerk.

The stream can not rise higher than its source, and we are dealing with facts and men as they exist and we are not justified in treating this matter from an Arcadian or Utopian standpoint. If only honesty and fairness were the objects in view in the selection of these election officers by the board, it is incredible that the republican majority would have so ruthlessly denied every respectful petition to allow representation to the democrats in the appointments, and when the refusal was buttressed with the announcement that it was a republican committee and that not even a challenger on behalf of the democrats would be permitted at the polls no court can shut its eyes to the purposes and perversions in view. School directors are sworn not only to support the constitution but to *impartially administer their positions*. One can hardly conceive of a stronger case of partisan partiality, or of absolute disregard of the rights of the public, in whose interests alone the board was created.

Without further discussion our conclusion is that in the action taken the school board so abused the discretion confided to it that it was a virtual refusal to perform the duty of holding an impartial election, and that in contemplation of law it has refused to act at all, and it is our duty to disregard its unjust action and require it by our mandate to proceed in a lawful way to hold said election.

The mere fact that it has essayed to act as it has presents no obstacle to the writ prayed in this case. Ample precedent will be found in the prior adjudications of this court. *State ex rel. v. Philips*, 97 Mo. 331; *State ex rel. v. Philips*, 96 Mo. 570. We regard this as settled law.

In *State ex rel. v. Philips*, 97 Mo. 331, the writ of *mandamus* was invoked to require the Kansas City court of appeals to reinstate an appeal which that court *had*

*dismissed,* and it was allowed and sustained. In that case SHERWOOD, J., after a most exhaustive discussion of the authorities, sustained the superintending power of this court to direct the reinstatement of the appeal notwithstanding the court had already acted and this court had no appellate jurisdiction from that court's decision.

The same principle is well illustrated by the case of *State ex rel. v. Lewis,* 71 Mo. 170. In that case the relator applied to the St. Louis court of appeals for an appeal to this court and that court had allowed it. When he applied to that court for the approval of his bond it refused to entertain it because an appeal had been granted, but this court awarded a *mandamus,* and held it was a matter of no importance that the term had passed.

And in *State ex rel. v. Philips,* 96 Mo. 570, *supra,* it was held that notwithstanding it was the duty of the court of appeals to certify the cause to this court during the term, it could not affect the power of this court to compel it to do so after the expiration of the term.

Those cases presented a much more serious legal difficulty than appears upon this record. Here, the duty of supervising the election of this director is still in the board, an unfinished and uncompleted duty and the effort of relator is to prevent an abuse of the discretion confided to it by the law.

Inasmuch, therefore, as the said board and the said election committee have failed and refused to perform their duty in an impartial manner, and the duty is cast upon this court to correct the abuse of their franchise, and inasmuch as the election laws of the state furnish a safe and certain rule of impartiality for the conduct of elections by the people, it is considered, ordered, and adjudged that the said school board and the said respondents proceed at once to revoke the said

partisan appointments of judges and clerks by them made on or about the fourteenth day of April, 1896, and that said board proceed on Saturday, May 2, 1896, to appoint judges and clerks of said election, one half of whom at each precinct shall be members of the republican party and one half thereof democrats, all to be taxpayers of said tenth district of good reputation as honest, law-abiding citizens, and qualified in every respect to act as judges and clerks of said election, and certify their obedience to this order. SHERWOOD and BURGESS, JJ., concur.