W. A. ROSS CONSTRUCTION COMPANY, a Corporation, Appellant, v. RICHARD CHILES and F. P. CHILES, Partners, Doing Business as CHILES MATERIAL COMPANY, CHARLES ABBEY, JOE ASH, H. ARNHOLT, CECIL BERGAS, J. D. ATKINSON, CLIFFORD BONNER, WM. BELCHER, R. F. BROWN, F. BONNER, A. B. BERKEBILE, R. T. BROWN, E. M. CAPPS, C. CHRISTER, V. CURTIS, A. E. CROUSE, CHESTER CURTIS, A. CHRESTOLIAR, A. A. DANIELS, CHARLES DRENNON, O. EIDSON, ROY ELDRED, W. ENLOW, E. M. EVANS, T. EPPERSON, O. ELLIOTT, JOS. ENGLEN, R. FOSTER, P. GERHARDT, E. GARRISON, T. B. HARBESSON, V. HUSTOR, HOMER HACK, E. HACK, L. C. HOLLIDAY, S. HALE, A. P. HACK, NORMAN JACKSON, L. KISSINGER, FRED KORFF, O. KELSE, B. F. KEITH, E. LYNCH, G. H. LEAGUE, L. MOULDER, RAY MAYBERRY, H. G. MERRITT, F. McALLISTER, R. MOULDER, C. MESSERSMITH, L. D. MITCHELL, J. T. MERRIOTT, C. McCLANAHAN, CHARLES MURPHY, BILL MILES, R. E. MARTIN, T. S. MORGAN, R. I. MADAL, A. W. MALCOM, J. D. MITCHELL, C. C. McCOLLOCK, F. NATIONS, A. NATIONS, J. NEWMAN, JOHN OVERLY, J. POWELL, L. PATTERSON, D. D. PHILLIPS, E. B. PHILLIPS, R. PRUITT, W. W. PHILLIPS, G. RICKER, LEE RHODES, DONALD ROSS, FRED RECTOR, K. STALLION, R. H. SCOTT, ERNEST SCOTT, J. E. SIDEWELL, WM. TUMNY, G. TURNER, J. R. TAYLOR, O. VARNER, L. WATERS, B. E. WHARRY, O. WEISMAN, E. WILLIAMS, T. R. WHITWORTH, J. R. WELSH, C. WOOD, VICTOR L. PHILLIPS, O. P. HACK, BAKER & SINGER GARAGE, W. H. POWELL LUMBER COMPANY, WHEATS ELECTRIC COMPANY, W. C. BROWN, WALTER VARNER, CAMDEN COUNTY LUMBER COMPANY, B. F. HER-

BERT, VARNER MOTOR COMPANY, CREACH MOTOR COMPANY, STANDARD OIL COMPANY, E. F. DONNER, PHILLIPS PETROLEUM COMPANY, OZARK CENTRAL TELEPHONE COMPANY, CAMDEN MOTOR COMPANY, FEASTER WALLACE, C. E. LOWELL, CROSSLEY SPECIALIZE COMPANY, R. W. VAUGHT, H. M. MERRIOTT, D. E. McCLANCHAN, and M. M. PRUSSING, ARTHUR CLINE and FRED JACOBS, Judges of the County Court of Camden County.—130 S. W. (2d) 524.

Division One, July 7, 1939.

1086

*Julius C. Shapiro* for appellant;  *L. Cunningham, Jr.,* of counsel.

*Warren M. Turner, Louren G. Davidson, Jack Curtis, Neale & Newman* and *Farrington & Curtis* for respondents; *Leo J. Harned* of counsel.

BRADLEY, C.—This cause was commenced July 12, 1935. Plaintiff designated the action as a "suit in the nature of an equitable interpleader." There are 116 defendants, and all except defendant, Massachusetts Bonding & Insurance Company were named as defendants in the petition when filed. The bonding company, which was plaintiff's surety in a bridge construction contract (October 16, 1934) with Camden County, was made a party on motion of defendants. After plaintiff secured the bridge contract, it entered into a contract (December 22, 1934) with Richard and F. P. Chiles, partners under the name of Chiles Material Company, to furnish, at $1.60 per ton, the sand and gravel, estimated at 7000 tons, to be used in the bridge construction. The Chiles company was, or became, insolvent, and the laborers, truck drivers, etc., who did work in the production and delivery of sand and gravel used in the bridge construction work by plaintiff, while the Chiles company operated, were not paid, and they contended that plaintiff and its surety were liable to them and should pay them. Plaintiff conceded that it owed the Chiles company $3185.92 for sand and gravel, but denied that it was otherwise obligated, and plaintiff paid the $3185.92 into court and asked the court to "require the various defendants and claimants to come into court . . . and prove their respective . . . interest . . . in and to said funds," and that the court "restrain and stay the defendants from all other proceedings in this matter . . . and for such other and further orders as the court may deem just and proper."

Defendants answered in three groups, namely, laborers, truck drivers, and supply furnishers, and the amount each individual claimed was stated. Only the name of the initial defendant in each group appears in the abstract. These groups denied that there was any interpleader case, and contended to the effect that the Chiles company was a subcontractor of plaintiff in the construction of the bridge, and that plaintiff and its surety were liable to them in an amount

aggregating about $8000, and this amount does not include the $3185.92 paid into court. The Chiles company claimed that plaintiff owed them $19,763.83, but the greater part of this claimed amount was for alleged damages for the claimed breach of a contract concerning only plaintiff and the Chiles company, further referred to *infra*. By motion to strike and by demurrer, plaintiff sought to confine the pleadings to the interplea theory, but was unsuccessful, and when compelled to reply plaintiff did so by a general denial, and a special plea to the effect that to hold it liable for the various claims of the defendants, other than the Chiles company, would be to make plaintiff ''answer for the debt, default or miscarriage of another,'' contrary to the Statute of Frauds.

The scope of the evidence was, in the main, confined, in so far as the case proceeded, to three questions: (1) Did plaintiff have an interpleader case or a case in the nature of an interpleader? (2) Was the Chiles company a subcontractor? (3) And, was plaintiff liable to the Chiles company for the breach of the claimed contract which concerned only plaintiff and the Chiles company? When the evidence on these questions was concluded, it was announced that it was the conclusion of the court that plaintiff's case was not one in interpleader, or one in the nature of interpleader; that Richard and F. B. Chiles (the Chiles company) were subcontractors of plaintiff in the construction of the highway bridge. And the court stated: ''I am not clear now that they (Richard and F. P. Chiles) are entitled to anything above the'' $3185.92 paid into court.

After making the above announcements the court said ''Now, I suppose, gentlemen, the next procedure in the case would be for these other defendants to try to establish their claims, if they wish; make a showing in regard to that matter.'' Thereupon, counsel for plaintiff announced: ''I am now advising Your Honor of our intention to apply for a writ of prohibition to the Supreme Court, and, of course, I would like Your Honor to give us time to do that; and I am now giving you notice. By the COURT: All right.'' Then the following appears:

''Now on this 13th day of November, 1936, comes again plaintiff by counsel, and come defendants by counsel, and at the conclusion of the hearing of all the evidence upon plaintiff's petition, plaintiff renews request made at the close of plaintiff's case, and again moves the court to enter an order sustaining said interplea, discharging said plaintiff, and requiring said defendants to interplead, which is denied by the court, over the objection and exception of plaintiff, and it is adjudged and decreed that said motion and order of the plaintiff requesting the court to sustain said interplea, and for an order requiring said defendants, claimants to interplead, and for an order discharging the plaintiff, is denied.''

Immediately following the order overruling plaintiff's motion to

sustain the interplea theory, Mr. Shapiro, counsel for plaintiff, said: "If Your Honor please, we now file a motion for a new trial. The COURT: I rather think you may be a little premature on that." However, a motion for a new trial was filed and overruled, and plaintiff appealed.

Judicially noticing our own records (Runnels v. Lasswell et al. (Mo. App.), 272 S. W. 1032; Bushman et ux. v. Barlow et al., 321 Mo. 1052, 15 S. W. (2d) 329; Bloecher v. Duerbeck, 338 Mo. 535, 92 S. W. (2d) 681) we ascertain that plaintiff, on November 13, 1936, sought prohibition in this court to prohibit the trial judge from proceeding further in the present case. Preliminary writ was issued, but peremptory writ was denied. [State ex rel. W. A. Ross Construction Co. v. Skinker, Judge, 341 Mo. 28, 106 S. W. (2d) 409.]

The record is quite voluminous, 550 pages, and within reasonable compass we shall endeavor to state the salient facts. It appears that the Chiles company first tried to dredge sand and gravel from the lake bed and transport it in barges to the bridge site, a distance of about 20 miles. Dredging from the lake bed did not go well, and also it was claimed by plaintiff that the sand and gravel that was produced from the lake bed was not up to standard and was not usable. Plaintiff and the Chiles company discussed the subject of getting sand and gravel by means of what is called a land plant. The Chiles company, according to their evidence, contended that the establishment of a land plant was too expensive just for the production of 7000 tons of sand and gravel, and that plaintiff, in order to induce them to set up the land plant, promised that they (the Chiles company) would get the sand and gravel contract on another contract plaintiff was then contemplating, and did get, from Camden County to erect another bridge across the lake, but the Chiles company did not get the sand and gravel contract. The claimed agreement that the Chiles company would get the sand and gravel contract for this second bridge is the contract which concerns only plaintiff and the Chiles company, referred to above. The Chiles company obtained a "gravel lease" from Charles E. Green, a former member of the Camden county court, and set up the land plant on Judge Green's land. The sand and gravel obtained from this plant had to be trucked overland a distance of about 12 miles and the Chiles company claimed that under a modified arrangement with plaintiff they were to get $1.10 per ton for getting out the sand and gravel at this plant, and that it was plaintiff's duty to transport it to a point near the bridge site. This was vigorously denied by plaintiff. The Chiles company made all the arrangements as to securing trucks in which to transport the sand and gravel, but claimed that such was done at the direction of plaintiff.

Things went along for awhile, and plaintiff complained that the Chiles company was not producing sand and gravel in sufficient quant-

ities, and the result of such complaint was that on April 1, 1935, the Chiles company signed a written memo, promising to deliver to plaintiff on April 2d, 3rd, 4th, and 5th respectively, a certain minimum number of cubic yards of sand and gravel. This memo also provided that in the event the Chiles company failed to deliver as specified, then plaintiff ''shall cancel out the contract now existing between us.'' Plaintiff claimed that the Chiles company failed to deliver the minimum yardage as promised, and on April 12th, ''cancelled out'' the sand and gravel contract by writing the Chiles company as follows:

''This is to advise you that we are today taking over the production of sand and gravel necessary for the construction of the substructure portion of the bridge over the Lake of the Ozarks. We take this action in accordance with the terms of our contract which now has become null and void.''

It appears that plaintiff got permission from Green to set up its sand and gravel plant on the same sandbar on which the Chiles company had its plant. Green said that plaintiff's representative told him that it was agreeable with the Chiles company (denied by them) for plaintiff to set up a sand and gravel plant on the Green land, already leased to the Chiles company. It appears that the Chiles company continued to produce and deliver some sand and gravel up to and including April 26, 1935, and then ceased operations.

The 8th and 9th paragraphs of the sand and gravel contract of December 22, 1934, between plaintiff and the Chiles company are as follows:

''8. It is fully understood and agreed between the parties hereto that for the faithful performance of this agreement by the party of the second part (the Chiles company) that said party of the first part shall retain ten (10) per cent of all claims or monies arising out of the furnishing and unloading of said materials (sand and gravel); said ten (10) per cent to be paid to the party of the second part at the completion of the faithful rendition of services under this agreement and the affimative showing and furnishing to party of the first, affidavits that all claims for work and materials and all bills of whatsoever nature arising out of the delivery and furnishing of sand or gravel to the above mentioned party of the first part have been fully paid and discharged.

''9. It is further understood and agreed that all liability insurance, compensation insurance, and all usual form of insurance coverage shall be carried by and at the expense of party of the second part, and party of the second part further agrees and does here indemnify and hold harmless the party of the first part from any and all claims or demands for damages, either in law or in equity arising out of or by virtue of the execution of this agreement with the party of the first part.''

In a summing up statement in which it was announced that the

court was of the opinion that the Chiles company was a sub-contractor, it appears that paragraphs 8 and 9 were considered of significant importance on that question. Also, in the summing up statement the court said:

"Considering all this evidence, while I am not entirely clear as to the amount that the Chiles Brothers may be entitled to, I mean as against the Ross Construction Company, I am inclined to limit it, so far as I can see now, very largely to the definite amount indicated by the plaintiff's evidence on that. If it shall turn out, upon the hearing of further evidence, that the claims of these other defendants for materials, or for hauling materials, and labor, and so on, run to anything like the amount counsel has indicated, that is, something like $8,000.00, I am very sure that the evidence would not justify the finding of anything in favor of the Chiles Brothers over and above that amount; I am not clear now that they are entitled to anything over the thirty-one hundred and some odd dollars."

As stated, plaintiff's petition was filed July 12, 1935, and as appears, supra, plaintiff asked that defendants be restrained "from all other proceedings in this matter." In the course of events, certain claimants (defendants) filed suit in a justice of the peace court against plaintiff for work and labor done in the production and delivery of sand and gravel while the Chiles company was functioning. Process in the justice court cases was issued October 1, 1935, and the inference is that those cases were filed on same date. October 17, 1935, plaintiff filed in the present cause, a petition or motion "to stay proceedings and for restraining order." The proceedings sought to be stayed were the justice of the peace cases, and on October 21, 1935, plaintiff obtained an order restraining and enjoining the named justice of the peace "from prosecuting such suits until the cause (the present cause) was fully heard and determined."

The above, supplemented by the facts as they appear in State ex rel. W. A. Ross Construction Co. v. Skinker, 341 Mo. 28, 106 S. W. (2d) 409, to which we make reference, is sufficient, we think, to appreciate the situation.

Plaintiff, appellant here, contends that, under the situation obtaining, the court had no power or jurisdiction to do anything except to adopt plaintiff's theory that an interpleader case was made, discharge plaintiff, and require those defendants who had unpaid claims to interplead, and to adjust their respective claims in the $3185.92 paid into court, or to dismiss the whole proceeding. As above noted, plaintiff denominated its petition or bill as "a suit in the nature of an equitable interpleader," but plaintiff says in the brief that "in the case at bar, as in a strict bill of interpleader, the plaintiff occupies the position of a mere stakeholder, neither having or claiming any interest in the fund deposited." Of course plaintiff is not bound by the designation of its case as being one in the

nature of a bill of interpleader. The case is whatever the pleadings and the facts make it, regardless of what name plaintiff gave it.

■ "A bill in the nature of a bill of interpleader is one in which the complainant seeks some relief of an equitable nature concerning the fund, or other subject matter, in dispute in addition to the interpleader of conflicting claimants. The complainant is not required, as in strict interpleader, to be an indifferent stakeholder without interest in the subject matter." [State ex rel. Reid v. Barrett (Mo. App.), 118 S. W. (2d) 33, l. c. 36, and cases there cited.] "The only material difference between a pure bill of interpleader and a bill in the nature of a bill of interpleader is that in the latter the plaintiff may show that he has an interest in the subject matter of the controversy between the defendants. Thus, in a bill in the nature of a bill of interpleader the defendants must claim the same thing from the plaintiff, a relation of privity must exist between the defendants, the plaintiff must not have incurred an independent liability to one of the defendants, and there must be an absence of other adequate remedy." [15 R. C. L., sec. 16, p. 233.]

■ "The remedy by interpleader is an equitable one, based on the theory that conflicting claimants should litigate the matter among themselves without involving the stakeholder in their dispute. A bill of interpleader is defined to be a bill exhibited where two or more persons severally claim the same debt, duty, or thing from the complainant under different titles or in separate interests; and he, not claiming any title or interest therein himself, and not knowing to which of the claimants he ought of right to render the debt or duty or deliver the property, is either molested by an action brought against him or fears that he may suffer injury from their conflicting claims, and therefore prays that they may be compelled to interplead, and state their several claims so that the court may adjudge to whom the matter or thing in controversy belongs." [33 C. J., sec. 2, p. 419.]

■ Clearly the facts here do not make a case of interpleader. Under these facts, plaintiff is not a mere stakeholder. An interplea contemplates that there is a controversy between claimants as to who is entitled to the fund or whatever is held. In the present case there is no such controversy. The controversy is between plaintiff *and* defendants, except as to a very few. This is apparent. Also, it is equally clear that this appeal is premature, as was suggested by the learned trial court. As appears, supra, plaintiff contends that the court should have sustained its theory of interpleader or should have dismissed the whole proceeding, and that the court had no power or jurisdiction to do otherwise. This contention is in the very teeth of the ruling in the prohibition case. There the court said (106 S. W. (2d) l. c. 411):

"In the case at bar, the respondent had jurisdiction over the parties and the subject matter, and proceeded in the cause according to

the course prescribed by law. This is not denied by the relator; in fact, the relator invoked the jurisdiction of respondent's court over both the subject matter and the parties when it filed its petition and brought the defendants into court by summons. If the respondent erred in the construction of the relator's petition, or gave weight and probative value to evidence which had no probative value, it would constitute error of law, reviewable on appeal, but would not amount to an abuse of judicial power for the redress of which a writ of prohibition would be issued. In other words, in construing the relator's petition, if the respondent came to the conclusion that the petition did not state a bill of interpleader, but was an equitable action asking affirmative relief so that the rights of all parties could be adjusted in one action, then he would not act in excess of his jurisdiction, even if his construction was erroneous; it would be mere error which could be corrected on appeal.''

Except as provided in Section 1018, Revised Statutes 1929 (Mo. Stat. Ann., sec. 1018, p. 1286, an appeal will not lie, except from a final judgment. Such law, of course, is elementary. There is no claim that the appeal here finds any support in the exceptions in Section 1018. Hence, if the appeal here is properly here, it must be on the theory that it is from a final judgment. ''A judgment is the final determination of the right of the parties in the action.'' [Sec. 1070, R. S. 1929, Mo. Stat. Ann., sec. 1070, p. 1370.] So far as the court had proceeded there had been no *final determination* of any issue raised, and could not have been until the *whole case* was closed. All that this appeal could dispose of, if entertained, would be the power of the trial court to do anything except sustain the interplea theory or dismiss the whole proceeding. The prohibition case ruled that the trial court would not be exceeding its jurisdiction to rule the questions involved.

The appeal should be dismissed and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur, except *Hays, P. J.,* absent.