**Doug BRADLEY, Gina Bradley, Ray Gallette, Eric Gallette, Sam Simpson, Betty Simpson, Gary Taber and Linda Taber, Plaintiffs–Respondents,**

v.

**K & E INVESTMENTS, INC., Defendant–Appellant.**

No. 18125.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 27, 1993.

Motion for Rehearing or Transfer
Denied Feb. 18, 1993.

Application to Transfer Denied
March 23, 1993.

---

William H. McDonald, Lee Ann Miller, Woolsey, Fisher, Whiteaker & McDonald, Springfield, for defendant-appellant.

John S. Dolence, Ruyle & Sims, Neosho, for plaintiffs-respondents.

PER CURIAM.

K & E Investments, Inc., appeals from four orders, each characterized by the parties and the trial court as "a final order in mandamus," by which the court ordered K & E to deliver to the plaintiffs certificates of ownership to certain used motor vehicles. Although the orders were erroneously designated, we affirm.

## FACTS

In late 1991, the plaintiffs attempted to purchase used motor vehicles from John Charleston and Cheryl Charleston who conducted business under the name Country Auto Sales. The plaintiffs paid for the vehicles and received possession of them, but they did not receive certificates of ownership. John Charleston told Gary Taber "he had his floor plan on his vehicles through a finance company in Kansas City," and Cheryl Charleston told him "it would be three to four days to get the title back." The remaining plaintiffs who testified said they were led to believe the Charlestons had the certificates of ownership. Cheryl Charleston told Doug Bradley she had the certificate and would send it to him in two days; she gave Ray Gallette a photocopy of the certificate and told him she would send the original to his bank. Sam Simpson obtained a vehicle on a weekend from John Charleston who told him he did not know where the certificate was and that Cheryl Charleston would find it. The plaintiffs later learned the certificates were held by K & E Investments, Inc.

In February and March 1992, the plaintiffs filed separate actions against K & E, the Gallettes' and Simpsons' actions denominated "Petition for Mandamus" and the Bradleys' and the Tabers' actions denominated "Petition for Mandamus, Petition for Preliminary Injunction and Petition for Conversion."[1] In each petition, the plaintiffs sought "an Order in Mandamus compelling Defendant K & E Investments, Inc., to immediately provide the certificate of title to the vehicle purchased."

K & E filed a separate "Counterclaim for Declaratory Relief to Quiet Title" in each action.[2] After separating the conversion counts (See Rule 66.02), the court tried the four causes, including the counterclaims, together.

At trial, Keith L. Roberts, secretary-treasurer and 50 percent owner of K & E, testified that K & E provides floor plan financing to used car dealers. Roberts explained the arrangement by which K & E furnishes floor plan financing to about 30 dealers for some 6,000 vehicles a year:

> The dealer, when they wanted to arrange for money on a vehicle they would provide us the title. And then we would advance the funds. And when they wanted to reclaim the title, they'd pay us off and we'd give them the title.

Concerning the vehicles the plaintiffs attempted to purchase, Roberts testified that K & E did not receive payment from Country Auto so it refused to surrender the certificates of ownership.

Attached to this opinion as appendices A, B, C, and D are reproductions of four documents admitted into evidence as K & E's trial exhibits. Of those four documents, Roberts testified:

> They are our security agreement with Country Auto Sales, a statement of terms for Country Auto Sales, a power of attorney from Country Auto Sales, and a fee schedule.

---

1. The Bradleys and the Tabers alleged their respective vehicles had been repossessed at the direction of K & E.

2. In its counterclaims, K & E sought relief that included:
 1. Declare that the attempted sale between John Charleston, d/b/a/ Country Auto Sales, and Plaintiffs ... was fraudulent and void and void pursuant to Mo.Rev.Stat. § 301.210.4;
 2. Declare that Plaintiffs ... have no right, title, or interest in and to said vehicle;

3. Declare that Defendant/Counterclaimant, K & E Investments, Inc., possesses full right to title and possession of said vehicle;
4. Quiet Defendant/Counterclaimant's title in said vehicle against Plaintiffs and all persons claiming under them, and permanently enjoin said individuals from asserting any adverse claim to Defendant/Counterclaimant's title to said property;
5. Declare that Defendant/Counterclaimant is entitled to full use, title and all possessory rights of said vehicle....

For convenience, we shall refer collectively to these four documents as the "floor plan agreement."

All the plaintiffs who testified denied knowing that the vehicles were subject to a lien or security interest. Only Gary Taber said he was aware that John Charleston had floor plan financing on his vehicles.

The certificates of ownership for the vehicles the Bradleys and the Simpsons attempted to purchase identify "Country Auto Sales" as "owner." The certificates applicable to the Gallette and Taber vehicles show "Country Auto Sales" as ultimate assignee.

On March 26, 1992, the trial court entered its "Final Order in Mandamus" by which it denied K & E's counterclaims and directed K & E to deliver to the plaintiffs the original certificates of ownership for the respective vehicles they had attempted to purchase from Country Auto Sales. On April 3, 1992, the court entered an order designating its order of March 26 "as final for the purposes of appeal pursuant to Missouri Rule of Civil Procedure 74.01, for the reason that there is no just reason for delay of said appeal."

In the description of the case portion of its notice of appeal, K & E specified the judgment or order appealed from as follows: "The Circuit Court ordered K & E to deliver the certificates of title to the vehicles to [the plaintiffs]. K & E alleges that the order in mandamus for delivery of said certificates of title is error. . . ."

## NATURE OF THE CAUSES OF ACTION AND THE TRIAL COURT ORDERS

■ The parties and the trial court erroneously characterized as mandamus the plaintiffs' claims for possession of the certificates of ownership.

Mandamus is a command issuing from a court of law of competent jurisdiction, in the name of the state or sovereign, directed to some inferior court, tribunal, or board, or to some corporation or person, requiring the performance of a particular duty therein specified, which duty results from the official station of the party to whom the writ is directed, or

from operation of law. This definition, which is frequently in effect carried into the statutes defining the writ, recognizes the public character of the remedy, and clearly excludes the idea that it may be resorted to for the purpose of enforcing the performance of duties in which the public has no interest.

52 Am.Jur.2d *Mandamus* § 1 (1970) (footnotes omitted). The public character of the remedy of mandamus has long been recognized in Missouri. In *State ex rel. Kelleher v. Board of President and Directors of St. Louis Public Schools*, 134 Mo. 296, 35 S.W. 617 (1896), this state's supreme court said of mandamus:

The ordinary function of this extraordinary original writ at common law is familiar. It is a command, in the name of the state, directed to some tribunal, corporation, or public officer, requiring it or him to do some specific act or particular thing, in the writ specified, which the court has previously determined that it is the duty of such tribunal, corporation, or officer to perform.

35 S.W. at 619. "The function of a writ of mandamus is to enforce, not establish, a claim or right and its purpose is to execute, not adjudicate." *Naugher v. Mallory*, 631 S.W.2d 370, 374 (Mo.App.1982).

Mandamus was not available to any of the plaintiffs in the actions they brought against K & E. The plaintiffs were not attempting to have a public body or officer enforce an already established right, and K & E had no established duty that the public had an interest in enforcing.

We note, however, "the character of a cause of action is determined from the facts stated in the petition and not by the prayer or name given the action by the pleader." *State ex rel. Conaway v. Consolidated School Dist. No. 4 of Iron County*, 417 S.W.2d 657, 659[3] (Mo. banc 1967). "The case is whatever the pleadings and the facts make it, regardless of what name plaintiff gave it." *W.A. Ross Const. Co. v. Chiles*, 344 Mo. 1084, 130 S.W.2d 524, 528[2] (1939).

In their petitions, the plaintiffs alleged they had demanded that K & E deliver the certificates of title and that K & E had refused, and the plaintiffs requested court orders directing K & E to deliver the certificates of ownership to them. What the plaintiffs sought were mandatory injunctions.

"An injunction is a writ framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience." *Cutten v. Latshaw,* 344 S.W.2d 257, 262[5] (Mo.App.1961) (quoting 43 C.J.S. *Injunctions* § 1 [now § 2 (1978)]). An injunction "commanding an act" is a mandatory injunction. *Chemical Fireproofing Corp. v. Bronska,* 553 S.W.2d 710, 714[6] (Mo.App.1977).

Missouri courts have invoked equitable principles to resolve competing claims related to motor vehicles where the parties to transactions did not comply with § 301.-210.4, RSMo 1986. *See, e.g., Van Hooser v. Banks,* 816 S.W.2d 25 (Mo.App.1991) (court declared good faith purchaser to be owner of vehicle; seller estopped to assert lack of compliance with statute); *Strebler v. Hampton Metro Bank,* 686 S.W.2d 28 (Mo.App.1984) (plaintiff stated a cause of action for a mandatory injunction for the delivery of a motor vehicle certificate of ownership). In the case before us, the trial court orders, each erroneously designated as "a final order in mandamus," shall be considered as mandatory injunctions.

## DISCUSSION AND DECISION

The trial court denied K & E's counterclaims and ordered it to deliver the original certificates of ownership of the four subject vehicles to the respective plaintiffs. By its notice of appeal and its brief and argument, K & E limits this appeal to a single issue: the right to possession of the certificates. Where this opinion discusses

matters such as ownership of the vehicles, the parties' respective rights to possession of the vehicles, and the existence and perfection of security interests or other liens, such discussion is entered solely for the purpose of resolving the question of the right to possession of the certificates of ownership.

In its sole point on appeal, K & E sets out what is essentially a twofold argument: the plaintiffs are not entitled to the certificates of ownership because the purported sales of the vehicles were fraudulent and void under § 301.210.4, RSMo 1986,[3] and K & E is entitled to possession of the certificates under its floor plan agreement with Country Auto Sales.

■ It is true, as K & E argues, that absolute technical compliance with § 301.-210 is required; without it a purported sale is fraudulent and void and the purported buyer acquires no ownership interest in the vehicle. *See, e.g., State Farm Mut. Auto. Ins. Co. v. M.F.A. Mut. Ins. Co.,* 485 S.W.2d 397, 400–01 (Mo. banc 1972); *State v. Glenn,* 423 S.W.2d 770, 774[1, 2] (Mo. 1968); *Allstate Ins. Co. v. Hartford Accident and Indemnity Co.,* 311 S.W.2d 41, 46[2, 3] (Mo.App.1958). Because the sales to the plaintiffs by Country Auto Sales are void, K & E concludes, the plaintiffs are not entitled to possession of the certificates of ownership. K & E's conclusion is erroneous.

■ Pending completion of the sales, Country Auto Sales, as the certificate owner of the respective vehicles, had a legal right to transfer possession of the vehicles to the plaintiffs without delivering properly assigned certificates of ownership. *Strebler,* 686 S.W.2d at 30 (citing *Allstate Ins.,* 311 S.W.2d at 47[10]). Each transaction was "an executory contract to be completed in the future." *Strebler,* 686 S.W.2d at 30. *See also Allstate Ins.,* 311 S.W.2d at 47[10]. The contracts were enforceable,

---

**3.** Section 301.210.4, RSMo 1986, provides:

It shall be unlawful for any person to buy or sell in this state any motor vehicle or trailer registered under the laws of this state, unless, at the time of the delivery thereof, there shall pass between the parties such certificates of owner-

ship with an assignment thereof, as provided in this section, and the sale of any motor vehicle or trailer registered under the laws of this state, without the assignment of such certificate of ownership, shall be fraudulent and void.

absent repudiation by Country Auto Sales or the plaintiffs. *Strebler*, 686 S.W.2d at 30; *Smith v. G.F.C. Corp.*, 255 S.W.2d 69, 70[1] (Mo.App 1953). *See also Cantrell v. Sheppard*, 247 S.W.2d 872, 875–76 (Mo. App.1952). As in *Strebler*, repudiation did not occur in any of the transactions now under consideration.

■ There is no evidence in the record to refute the existence of an executory contract, no evidence from which we reasonably could infer an intent by the plaintiffs to obtain ownership to the vehicles without proper assignment of the certificates of ownership. Moreover, we do not presume such intent. *See Strebler*, 686 S.W.2d at 30; *Allstate Ins.*, 311 S.W.2d at 47[10]. Thus the plaintiffs had the right to compel assignment of the certificates of ownership by Country Auto Sales; to do so they had the right to seek delivery of the certificates from K & E. *See Strebler*, 686 S.W.2d at 30.[4] Section 301.210.4 does not operate to prohibit the plaintiffs from obtaining possession of the certificates of ownership.

K & E's second argument in support of its allegation of trial court error is that its floor plan agreement with Country Auto Sales entitles it to possession of the certificates. Undergirding this argument is K & E's assertion that, pursuant to agreement with Country Auto Sales, it had liens on the vehicles that the plaintiffs attempted to purchase, and its possession of the certificates of ownership constituted some sort of substitute for perfection of those liens. We quote from K & E's brief:

> [John Charleston] created the lien with K & E by entering into the floor plan financing agreement with K & E, and by accepting financing for those vehicles.... [T]here is no provision under Missouri law for an individual providing financing for a motor vehicle dealer under a floor plan agreement in this state to perfect its lien.... The only protection available to K & E and other floor-plan financiers is to do exactly what K &

E did—hold the certificates of title to all financed vehicles. This is the method used by virtually all floor planners within the state. To interpret the statutes otherwise would place the financing for nearly every motor vehicle in the state in jeopardy.

At oral argument K & E insists the Uniform Commercial Code (U.C.C.) is not applicable to this case; however, at no point in its briefs and oral argument does K & E inform us of the theory upon which it bases its claim that it obtained liens on the vehicles.

K & E's argument that the U.C.C. is inapplicable is incorrect. U.C.C. Article 9, Secured Transactions, is found at §§ 400.9–101 through 400.9–507, RSMo 1986 & Supp. 1988. The scope of Article 9 is stated in § 400.9–102, RSMo Supp.1988:

> (1) Except `as otherwise provided in section 400.9–104 on excluded transactions, this article applies

> (a) to any transaction (regardless of its form) which is intended to create a security interest in personal property....

> (2) This article applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This article does not apply to statutory liens except as provided in section 400.9–310.

■ The term *security interest* is defined in § 400.1–201(37), RSMo Supp.1988, as "an interest in personal property or fixtures which secures payment or performance of an obligation."

From the testimony of K & E's officer and co-owner Keith Roberts concerning the floor plan agreement, we conclude Country Auto Sales and K & E intended to create a security interest in personal property, namely, the motor vehicles. The exceptions noted in §§ 400.9–104 and 400.9–310

---

4. K & E attempts to distinguish this case from "the result-oriented decision in *Strebler*." To do so, it contrasts its situation with that of the lienholder bank in *Strebler*. However, K & E's argument is based on the erroneous assumption it had acquired liens on the vehicles in question. As we will discuss, we have concluded K & E had no liens.

are inapplicable to this case. U.C.C. Article 9 applies. § 400.9–102, RSMo Supp. 1988.[5]

The applicability of Article 9 to the creation of a security interest in a motor vehicle is stated succinctly in 8 *Anderson on the Uniform Commercial Code* § 9–203:8 at 664 (3d ed. 1985):

> Secured transactions in motor vehicles are governed by the same principles as govern secured transactions in other types of collateral insofar as the creation and effect of a secured transaction therein is concerned. The fact that title certificate notation is required in most states to perfect a security interest in a motor vehicle in the hands of the ultimate user has no effect upon the creation of a security interest in a motor vehicle. (Footnote omitted).

We return now to K & E's argument that it is entitled to retain possession of the certificates of ownership because it has an unperfected "lien" on the vehicles. We first must determine whether John Charleston created a security interest in the vehicles in favor of K & E. To do so, we examine the floor plan agreement in light of relevant provisions of U.C.C. Article 9. Section 400.9–203, RSMo Supp.1988, provides, in pertinent part:

> (1) ... [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless
>
> (a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ... and
>
> (b) value has been given; and
>
> (c) the debtor has rights in the collateral.
>
> (2) A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection (1) have taken place unless explicit agreement postpones the time of attaching.
>
> (3) Unless otherwise agreed a security agreement gives the secured party the rights to proceeds provided by section 400.9–306.

■ We have already recited the U.C.C. definition of a *security interest*. The term *security agreement* "means an agreement which creates or provides for a security interest." § 400.9–105(1)(*l*), RSMo Supp. 1988. A security agreement has been described as "the document which delineates the scope of the debtor/creditor relationship and gives meaning to the abbreviated terms of the financing statement." *Polk County Bank v. Graven*, 745 S.W.2d 793, 795[1] (Mo.App.1988). Although no precise words are required by the statutory definition of *security agreement*, the definition indicates there must be some language in the agreement that actually conveys a security interest. *Shelton v. Erwin*, 472 F.2d 1118, 1120[3] (8th Cir.1973).

For purposes of Article 9, a description of personal property is sufficient "if it reasonably identifies what is described." § 400.9–110, RSMo 1986.

For several reasons, the floor plan agreement appended to this opinion fails to create a security interest in favor of K & E in the vehicles the plaintiffs attempted to purchase.

First, we find no language in the floor plan agreement that meets the § 400.9–203(1)(a) requirement that the debtor, Country Auto Sales, sign a security agreement as that term is defined in § 400.9–105(1)(*l*). Examination of the floor plan agreement reveals that it was "for servicing titles only." Any fees charged under the agreement were "soley for title fees" and were "not to be construed as interest or on an interest bearing basis." The floor plan agreement avoids the use of terms commonly associated with secured transactions such as *lien, collateral, debtor, secured party, security agreement, security*

---

5. Our concern at this point is the question of whether security interests in the vehicles were created. We recognize, and will discuss, the provisions of RSMo Chapter 301 regarding the "perfecting and giving notice of liens or encumbrances" on certain motor vehicles. *See* § 301.-650, RSMo 1986.

*interest, chattel paper, chattel mortgage, mortgagor,* or *mortgagee.* Although phrases in the floor plan agreement such as "all funds K & E has paid," "if default should occur," "unpaid balances of accounts," and "all funds due" might be read to hint at the existence of some sort of lender-borrower relationship, they do not convey a security interest. *See Shelton,* 472 F.2d at 1120[3].

Second, the floor plan agreement does not meet the § 400.9–203(1)(a) "description of the collateral" requirement as defined in § 400.9–110. In *Coseo v. Alpena Savings Bank,* 612 F.2d 276 (6th Cir.1980), the court, applying Michigan law, concluded that the phrase "all inventory financed through these transactions" in a dealer floor plan agreement met the requirement of U.C.C. 9–110 that the collateral be reasonably identified. 612 F.2d at 277. Although the phrase "all inventory financed through these transactions" does not of itself identify specific vehicles, it does set parameters for a subsequent determination of whether a specific vehicle is subject to a security interest. *See also* Richard C. Tinney, Annotation, *Sufficiency of Description of Collateral in Security Agreement under UCC §§ 9–110 and 9–203,* 100 A.L.R.3d 940 §§ 26 and 45 (1980).

In the case before us, although the floor plan agreement refers to "cars," "vehicles," and "a unit," the agreement not only does not use these terms in the context of a secured transaction, it also fails to indicate that the "cars," "vehicles," and "a unit" are inventory. We find nothing in the floor plan agreement that meets the relatively lenient threshold of § 400.9–110.

■ We conclude that under U.C.C. Article 9, no security interest was created in the vehicles. K & E develops no argument that it has a common law lien, or any other type of lien, on the vehicles.

We turn now to K & E's argument that its holding of the certificates of ownership was a substitute for lien perfection which was otherwise not available. This argument is without merit for at least two reasons, the first of which is that, because K & E had no security interest in the vehicles, the concept of perfection is irrelevant. See, e.g., *Shelton,* 472 F.2d at 1120[4].

Second, under U.C.C. Article 9, perfection was available, had a security interest existed. As K & E correctly points out, §§ 301.600 to 301.660, RSMo 1986, provide the exclusive method of perfecting and giving notice of liens or encumbrances on motor vehicles, unless one of five statutory exceptions applies. One of those exceptions does apply to this case. § 301.650.-1(3) provides, "Sections 301.600 to 301.660 do not apply to or affect ... [a] lien or encumbrance on a motor vehicle or trailer created by a manufacturer or dealer who holds the motor vehicle or trailer for sale...." However, the fact that §§ 301.-600 to 301.660 do not apply to this case does not mean a security interest in a motor vehicle dealer's inventory cannot be perfected. Under U.C.C. Article 9, a floor plan lender can perfect a security interest in a dealer's inventory and proceeds. §§ 400.9–203(3), 400.9–302(3)(b), and 400.9–306, RSMo Supp.1988; *Farmers and Merchants Bank of St. Clair v. Borg–Warner Acceptance Corp.,* 665 S.W.2d 636, 640[5, 6] (Mo.App.1983); *In Re Crewse,* 5 B.R. 391, 397 (W.D.Mo.1980).

Relying on § 301.210.1, RSMo 1986, K & E argues it has no duty as the holder of a certificate of ownership to deliver it to a buyer until there is a sale, and, in the case of the instant transactions, there were no sales because there was no delivery of the certificates of ownership. The circularity of this argument is patent; the reason for the argument is negated by the availability of a perfected security interest in proceeds pursuant to §§ 400.9–203(3) and 400.9–306, RSMo Supp.1988.

K & E's argument for possession of the certificates of ownership as a substitute for perfection has no merit.

■ Because it is unclear to us whether K & E also views the certificates of ownership as collateral, the following observations are necessary. § 400.9–203(1)(a) provides for attachment of a security interest in collateral in the absence of a signed

security agreement where "the collateral is in the possession of the secured party pursuant to agreement. . . ." We have serious doubts about whether a motor vehicle certificate of ownership can be subject to a security interest or any other type of lien.

Moreover, the floor plan agreement is insufficient to satisfy the introductory portion of § 400.9–203(1)(a). In *Grossmann v. Saunders*, 237 Va. 113, 376 S.E.2d 66 (1989), the Virginia Supreme Court examined the phrase "pursuant to agreement" and held that "evidence of agreement must establish that the secured party possesses the collateral *for the purpose of securing the debtor's obligation.*" *Id.* 376 S.E.2d at 71[6] (emphasis added). We have already expressed our view about the shortcomings of the floor plan agreement for purposes of creating a security interest under U.C.C. Article 9.

We find analogous support for our decision in *Pearson v. Allied Finance Co.*, 366 S.W.2d 6 (Mo.App.1963), the facts of which are remarkably similar in most respects to those of the case before us. Two significant factual differences exist. One, in *Pearson*, the motor vehicle dealer, Page–Way Motors, executed a chattel mortgage, pursuant to § 443.460, RSMo 1959, encumbering the subject vehicle in favor of lender, Allied Finance Company. In our case, there is nothing analogous to a chattel mortgage because of the inadequacy of the floor plan agreement to serve as a security agreement. The second factual distinction

is that, after Allied's repossession, Pearson sought possession of the vehicle itself, not the certificate of ownership as the plaintiffs in our case seek. The court of appeals concluded that Pearson could bring the replevin action against Allied, which had not recorded the chattel mortgage and which the court characterized as "one without any right, such as a mere trespasser." 366 S.W.2d at 9[4]. The court permitted Pearson to recover possession of the vehicle from Allied, which had a chattel mortgage (albeit unrecorded) on it; it appears the plaintiffs before us have a stronger case for recovery from K & E of certificates of ownership of vehicles in which K & E has no security interest.

The trial court did not err in ordering K & E to deliver the certificates of ownership to the plaintiffs. The judgments are affirmed.[6]

PARRISH, C.J., dissents in separate opinion.

## APPENDICES

(All underscored words were handwritten in the original documents)

## APPENDIX A

(On K & E Investments, Inc. letterhead)
### ACKNOWLEDGEMENT OF CONTRACTUAL OBLIGATION

The undersigned hereby acknowledge that he/she has read the attached agree-

---

**6.** In his dissent, Chief Judge Parrish states his view that the judgments should be reversed and the causes remanded to the trial court because the Charlestons, operators of Country Auto Sales, are indispensable parties who were not joined in these actions. Our understanding of Rule 52.04(a) and our reading of *Strebler,* 686 S.W.2d 28, convince us otherwise.

Rule 52.04(a) provides:
A person shall be joined in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of

his claimed interest. If he has not been joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant.

We believe complete relief regarding the right to possession of the certificates of ownership could be accorded among those already parties without joining the Charlestons in the actions. Moreover, there is nothing in the record to suggest the Charlestons claim an interest relating to the possession of the certificates.

From the *Strebler* opinion, it appears the only parties to the action were the purported purchaser of the vehicle and the defendant bank that possessed the certificate of ownership. The other party to the attempted sale, J–B Enterprises, Inc., the certificate owner of the vehicle, was not a party. The *Strebler* court did not question the absence from the lawsuit of the certificate owner of the vehicle.

ment carefully, understands said agreement and the effects thereof, and that said agreement is a legally binding contractual agreement.

The undersigned further states that he/she is aware that they have the right to have their own independent legal representative review all documents before signing.

Country Auto Sales
/s/ John L. Charleston

(Acknowledgement by notary public)

APPENDIX B

K & E INVESTMENTS, INC.

205½ Oak Str.

P.O. Box 236

Bonner Springs, Ks. 66012

422–2073

This agreement between K & E Investments, Inc., hereafter referred to as K & E., and John Charleston hereafter referred to as dealer, is for servicing titles only. Costs are based on a prorated basis and fee schedule is a part of this agreement.

Dealer agrees to pay K & E all funds K & E. has paid plus title processing fee according to the schedule attatched [sic]. Dealer agrees if default should occur all cars and titles belong to K & E. and K & E. has sole right to sell all vehicles and apply funds to unpaid balances of accounts which the dealer has with K & E..

Dealer agrees to give K & E. a blanket Power of Attorney and agrees K & E. may use this to dispose of or sell all vehicles and titles as K & E. deems is necessary and apply proceeds to the dealers accounts.

Dealer agrees to allow K & E. to inspect all vehicles for which K & E. has processed titles at any time.

Dealer agrees to pay fees up current when a vehicle reaches 60 Days Old. Dealer also agrees to pay a 10% reduction when a unit reaches 90 Days Old as well as the additional fee due. K & E. will send out a statement reflecting the fees and reductions due on the twentieth of each month. This statement is due upon receipt.

Either party, K & E. or dealer may cancell [sic] this agreement with or without written notice. If cancellation does occur dealer agrees to pay K & E. all funds due within three days.

It is understood that fees charged by K & E. are soley [sic] for title fees and are not to be construed as interest or on an interest bearing basis.

K & E INVESTMENTS, INC.

Country Auto Sales

Accepted By: /s/ Ed Roberts, Jr.[7]

Accepted By: /s/ John L. Charleston

DATE: 12/31/90

APPENDIX C

| | First 15 Days | First 30 Days | Extra 30 Days |
|---|---|---|---|
| Up to 1000 | $ 60.00 | $ 60.00 | $ 60.00 |
| 1000 to 1999 | $ 60.00 | $ 60.00 | $ 60.00 |
| 2000 to 2999 | $ 60.00 | $ 70.00 | $ 60.00 |
| 3000 to 3999 | $ 60.00 | $110.00 | $ 90.00 |
| 4000 to 4999 | $ 60.00 | $110.00 | $ 90.00 |
| 5000 to 5999 | $ 85.00 | $160.00 | $130.00 |
| 6000 to 6999 | $ 85.00 | $160.00 | $130.00 |
| 7000 to 7999 | $ 85.00 | $160.00 | $130.00 |
| 8000 to 8999 | $110.00 | $160.00 | $130.00 |
| 9000 to 9999 | $110.00 | $160.00 | $130.00 |
| 10,000 to 10,999 | $120.00 | $170.00 | $130.00 |
| 11,000 to 11,999 | $130.00 | $190.00 | $150.00 |

7. (From the testimony of Keith Roberts, we learn that Ed Roberts, Jr. is the president and 50 percent owner of K & E Investments, Inc. Keith Roberts and Ed Roberts, Jr. are brothers.)

| | First 15 Days | First 30 Days | Extra 30 Days |
|---|---|---|---|
| 12,000 to 12,999 | $140.00 | $190.00 | $150.00 |
| 13,000 to 13,999 | $150.00 | $210.00 | $160.00 |
| 14,000 to 14,999 | $160.00 | $210.00 | $160.00 |
| 15,000 to 15,999 | $170.00 | $260.00 | $210.00 |
| 16,000 to 16,999 | $180.00 | $260.00 | $210.00 |
| 17,000 to 17,999 | $190.00 | $310.00 | $250.00 |
| 18,000 to 18,999 | $200.00 | $310.00 | $250.00 |
| 19,000 to 19,999 | $210.00 | $310.00 | $250.00 |
| Over 20,000 | $260.00 | $360.00 | $360.00 |

New Rate Chart effective October 20th, 1989.

---

APPENDIX D

K & E INVESTMENTS, INC.

205½ Oak Str.

P.O. Box 236

Bonner Springs, Ks. 66012

422–2073

POWER OF ATTORNEY

Know all men by these presents, that the undersigned

John Charleston

Buyer, Seller or Legal Owner

does hereby make, constitute and appoint K & E Investments, Inc., its officers or employees my(our) true and lawful Attorney and do give and grant to my said attorney, full power and authority to sign in the name, place and stead of the under-signed Certificates of Ownership (titles), title to

Country Auto Sales.

Accepted by Dealer: Country Auto Sales By: /s/ John L. Charleston

In witness whereof, I (we) have signed this instrument this 31 day of December, 1990.

(Acknowledgement by notary public)

PARRISH, Chief Judge, dissenting.

I respectfully dissent. I disagree with the majority opinion in a number of respects. Foremost, I believe that the majority opinion fails to identify the real issue that the parties to this appeal have attempted to litigate. In my opinion, the underlying issue in each of the four cases that somehow reached this court as a single appeal [1] is the ownership of a particular

1. The only references to consolidation in the record on appeal are docket entries dated "3-12-92" that appear in docket sheets for each of the four cases. The docket entry in each case is the same. It states, "Parties stipulate that four cases (CV392–81CC, CV392–82CC, CV392–155CC and CV392–80CC) are consolidated for trial." If the stipulation was perceived to be a motion to consolidate the four cases for trial, there should have been a determination of that motion by the trial court, an "exercise of a sound judicial discretion." *State ex rel. Rosen v. McLaughlin*, 318 S.W.2d 181, 184 (Mo. banc 1958); *Hammons v. Eisert*, 745 S.W.2d 253, 258 (Mo.App.1988). See Rule 66.01(b). "The exercise of a sound judicial discretion is not the indulgence of a judicial whim, but the exercise of judicial judgment, based on facts and guided by law—a discretion bounded by the rules and principles of law, and not arbitrary, capricious or unrestrained." *Rosen, supra*. The four cases are apparently being considered on appeal as if they were consolidated for trial as permitted by Rule 66.01(b), notwithstanding the absence in the record on appeal of an order so directing.

Regardless, consolidation does not destroy the separate identity of causes of action. "When actions are consolidated ..., they are not merged but remain separate and distinct actions. *Cragin v. Lobbey*, 537 S.W.2d 193, 195 (Mo.App.1976). In short, consolidation, ... does not change the rights of the parties or make those who are parties in one, parties in the other. *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–97, 53 S.Ct. 721, [727–28] 77 L.Ed. [1331] 1467 (1933)." Mo.Civil Procedure, Rule 66.01 (MoBar 1983, 1988). The separate appeals in cases that were consolidated for trial may be consolidated by the appellate court. See *Hammons v. Eisert, supra*, at 255. However, this court did not receive appeals in each of the four cases. One notice of appeal was filed that bears the notation "Consolidated cases—see attached." A sheet of paper attached to the notice of appeal identifies the parties who were plaintiffs in each of the four cases that were filed in the trial court and the respective case numbers from the trial court. It identifies the single defendant in each case, K & E Investments, Inc. Query: are all four cases properly before this court for appellate review?

motor vehicle. The majority opinion states that the case presents a single issue, "the right to possession of the certificates [of ownership]." I disagree. The only meaning attributable to a certificate of ownership to a motor vehicle is that it serves as prima facie evidence of ownership of the vehicle to which it applies. *See State v. Lippert,* 595 S.W.2d 22, 24 (Mo.App.1979). Its proper assignment is the means by which ownership of a vehicle is transferred. *Herbert v. Harl,* 757 S.W.2d 585, 590 (Mo. banc 1988). The possession of a certificate of ownership is otherwise meaningless. The issue presented, albeit in a somewhat veiled manner, in my opinion, is who owns the automobiles in question. The claim of appellant that it is entitled to negotiate certificates of title in order to sell the motor vehicles and apply the sales proceeds to debts it is owed is derived from Country Auto Sales. Respondents' respective claims to the vehicles in question are derived from Country Auto Sales.

The certificates of ownership identified Country Auto Sales as the owner of each motor vehicle. Because the certificates had not been assigned by Country Auto Sales, absent the presence of John Charleston and Cheryl Charleston—the persons who did business as Country Auto Sales—as parties to this action, the possession of the certificates are meaningless insofar as resolving disputes between appellant and respondents are concerned. Any attempted resolution in an action in which the Charlestons were not parties would have been subject to relitigation by John Charleston and Cheryl Charleston. As such, there are fatal procedural defects in the judgments entered by the trial court.

In my opinion, the Charlestons are indispensable parties. *See* Rule 52.04(a). The failure to join them is so fundamental and jurisdictional as to require consideration by this court notwithstanding that the parties to this appeal did not raise that issue.

*Neal v. Drennan,* 640 S.W.2d 132, 136 (Mo. App.1982).

Although I believe that the foregoing should be dispositive of this case, that it requires that the judgments entered in the four "consolidated cases" be reversed (if in fact the appeals in all four cases are otherwise validly before this court—see n. 1, *supra*), and that the cases be remanded for new trial(s) with directions that the trial court join the indispensable parties in accordance with Rule 52.04(a), there are statements regarding other issues in the principal opinion with which I differ and which require further comment.

In attempting to establish an issue between the parties to this appeal that was capable of resolve, the principal opinion states, "Missouri courts have invoked equitable principles to resolve competing claims related to motor vehicles where the parties to transactions did not comply with § 301.-210.4, RSMo 1986." [2] Two cases are cited for that proposition, *Van Hooser v. Banks,* 816 S.W.2d 25 (Mo.App.1991); and *Strebler v. Hampton Metro Bank,* 686 S.W.2d 28 (Mo.App.1984). From those cases, the principal opinion apparently concludes that the facts of this case present a justiciable question regarding whether a mandatory injunction may properly issue to compel appellant to deliver certificates of ownership to respondents. I do not agree that the cases cited support the proposition that this case presents an issue that can be determined as between the present parties.

The principal opinion parenthetically summarizes the issues that were determined in *Van Hooser* as "[the] court declared good faith purchaser to be owner of vehicle; seller estopped to assert lack of compliance with statute." That summarization is accurate; however, the determinations made by the court in *Van Hooser* applied to factual circumstances in that

**2.** § 301.210.4, RSMo 1986, states:

It shall be unlawful for any person to buy or sell in this state any motor vehicle ... registered under the laws of this state, unless, at the time of the delivery thereof, there shall pass between the parties such certificates of ownership with an assignment thereof, as herein provided, and the sale of any motor vehicle ... registered under the laws of this state, without the assignment of such certificate of ownership, shall be fraudulent and void.

case that I believe were unlike those in this case.

Mr. and Mrs. Van Hooser owned an automobile that they wanted to sell. Both of their names were on the certificate of ownership. They contacted a consignment seller, Plaza Auto Consignment, and sought its assistance in selling the automobile. Plaza Auto Consignment found a buyer for Van Hoosers' automobile, Mr. Banks. Mr. and Mrs. Van Hooser delivered their automobile to Plaza Consignment after they were told that Mr. Banks had agreed to buy it.

Plaza Auto Consignment requested the Van Hoosers to sign the assignment on the vehicle's certificate of ownership in exchange for Plaza's check—the check was not certified or otherwise guaranteed by the financial institution upon which it was drawn. Mr. Van Hooser signed the assignment of the certificate of ownership but Mrs. Van Hooser did not. Plaza Auto Consignment was directed to hold the certificate of ownership until after the check it had delivered to the Van Hoosers was honored. Mrs. Van Hooser was to then sign the assignment on the certificate.

The certificate of ownership was delivered to Mr. Banks without Mrs. Van Hooser's signature—a forgery of her signature appeared on the document. Plaza's check to the Van Hoosers was not paid. However, Mr. Banks had obtained a certificate of title from the Department of Revenue by reason of the apparent assignment (by means of the forged signature) to him of the certificate of ownership that had been issued to the Van Hoosers. Mr. Banks obtained a loan from Citizens Bank in order to purchase the automobile. Citizens Bank had taken a security interest in the automobile from Mr. Banks.

The Van Hoosers attempted to replevy the automobile from Mr. Banks and sought a declaratory judgment that they were the owners of it. The court held:

> The Van Hoosers acted at their peril when they delivered possession of the vehicle together with the primary indicia of ownership to Plaza Auto. By relinquishing possession of the vehicle and the certificate of title, the Van Hoosers

clothed Plaza Auto with the authority to commit the fraud and failed to observe the law or follow it. When an innocent party is the victim of that wrong, then as between the two of them, the one who set the scene should bear the loss. [Citations omitted.] Equity should balance the competing interests and *under these facts*, should intervene and estop the Van Hoosers from taking advantage of the statute. [Emphasis added.]

816 S.W.2d at 28–29. The court pointed out that "[t]he certificate of title when delivered to Mr. Banks was on its face correct in every respect and neither Mr. Banks nor Citizens Bank was aware or should have had reason to be concerned that anything was wrong with the title." *Id.* at 28.

Here, none of the respondents received certificates of title at the time they acquired the respective motor vehicles from Country Auto Sales. They were not innocent parties. Likewise, appellant was not involved in the dealings between the respective respondents. Appellant did not "set the scene" that produced respondents' losses. Further, in *Van Hooser*, the Van Hoosers, Mr. Banks and Citizens Bank were parties to the action; therefore, the issue of ownership of the motor vehicle could be determined. In this case, the Charlestons are not parties. The holdings in *Van Hooser* are not applicable to this case.

In discussing *Strebler*, the principal opinion parenthetically summarizes its holding as "plaintiff stated a cause of action for a mandatory injunction for the delivery of a motor vehicle certificate of ownership." I did not glean that to be the holding in *Strebler*. The only holding that I find stated in *Strebler* is that one count in an amended petition that the trial court had dismissed for failure to state a cause of action, Count IV, had stated a cause of action for conversion. *See Strebler, supra,* at 1.c. 30. Further, the facts in *Strebler* differ significantly from those in the present case.

Mr. Strebler attempted to purchase an automobile from J–B Enterprises, Inc.

Hampton Metro Bank was a lien holder. Hampton Bank had possession of the certificate of ownership. On the same day that Strebler agreed to purchase the car, took possession of it and delivered another vehicle as a trade-in, J–B tendered a payoff draft to Hampton Bank. The bank marked the title (the certificate of ownership) on which its lien was reflected, "Paid and released." 686 S.W.2d at 29. The draft failed to clear. The draft, together with the title, was returned to the bank.

Mr. Strebler informed the bank that he had the automobile. He attempted to negotiate a direct payoff with the bank. While his negotiations were underway, the bank repossessed the car and obtained a repossession title and sold the automobile to a third party. The court held that Mr. Strebler could maintain an action against the bank for conversion. In so holding the court pointed out that J–B had acknowledged Mr. Strebler's contractual rights to possession of the automobile that the bank had repossessed. *Id.* at 30. It further stated, "Both J–B and [Mr. Strebler] were attempting to comply with the statute [§ 301.210.4 [3]] and the actions and conduct of [the bank], as alleged in the petition, were directed to preventing compliance." *Id.* at 30–31.

In *Strebler*, the seller of the automobile, J–B Enterprises, Inc., was involved in the buyer's efforts to complete the sale. In this case, Country Auto Sales is, in all respects, a stranger to respondents' claims. I do not believe that the holdings in *Strebler* are applicable to this case.

The final issue with which I disagree is the principal opinion's determination that because appellant had not perfected liens on the motor vehicles that respondents had attempted to purchase, it had no right to possess the certificates of ownership to those vehicles. Country Auto Sales owned all of the motor vehicles. Country Auto Sales entered into an agreement with appellant "for servicing titles only," by which Country Auto Sales authorized appellant to negotiate the certificates of ownership that were delivered to appellant, as Country

Auto Sale's attorney-in-fact; to sell the automobiles "if default should occur;" and, to "apply funds to unpaid balances of accounts which the dealer has with [appellant]." I see nothing illegal or unconscionable about such an agreement regardless of the fact that appellant had not perfected liens on the various automobiles to which it possessed certificates of ownership showing Country Auto Sales as owner. The arrangement afforded appellant some protection against Country Auto Sales disposing of the motor vehicles without repaying loans that appellant made to Country Auto Sales. Since § 301.210.4 provides that the only way that ownership of a vehicle may be transferred is by assignment of a certificate of ownership, appellant, by having possession of certificates of ownership for cars it had financed, could monitor the disposition that Country Auto Sales made of those cars. That protection was not as good as the protection that valid liens would have provided. Nevertheless, it was practical and lawful. I do not believe that the disposition of this case should turn on who was the innocent and injured party; however, if it does, arguably, it is appellant not respondents whose acts were free of fault. Respondents took possession of motor vehicles that they desired to purchase without requiring Country Auto Sales to deliver the properly assigned certificates of ownership to those vehicles as is required by § 301.210.4. Appellant did no act that could be construed to be unlawful.

I believe the trial court erred in directing appellant to deliver the certificates of ownership because the real issue for adjudication was the ownership of the vehicles, an issue that could not be decided because of the absence of the Charlestons (Country Auto Sales) from the proceeding. Additionally, however, even if the Charlestons were not indispensable parties (which I believe them to be), I disagree with the assessment in the principal opinion that the law as established by prior Missouri cases requires this case to be determined by applying "equitable principles." Furthermore, if the law is as the principal opinion

---

3. References to statutes are to RSMo 1986.

pronounces, I believe that under the facts of this case appellant is entitled to prevail.